REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIME WARNER CABLE INC., | |
| Plaintiff, | **11 CIV 2376** |
| v. | Civil Action No. _____ |
| VIACOM INTERNATIONAL INC., COMEDY PARTNERS, BLACK ENTERTAINMENT TELEVISION LLC, and COUNTRY MUSIC TELEVISION, INC., | **COMPLAINT FOR DECLARATORY RELIEF** |
| Defendants. | |



Plaintiff Time Warner Cable Inc. ("TWC"), by its undersigned attorneys, for its

complaint for declaratory judgment against Defendants Viacom International Inc. ("Viacom"),

Comedy Partners, Black Entertainment Television LLC ("BET"), and Country Music Television,

Inc. ("CMT") (together, the "Viacom Defendants"), alleges as follows:

## NATURE OF THIS ACTION

1.    Plaintiff TWC brings this action for declaratory judgment to clarify certain rights and

obligations under agreements by and between TWC and the Viacom Defendants (together, the

"Viacom Affiliation Agreements").

2.    The Viacom Affiliation Agreements grant to TWC a broad right of carriage to

distribute the Viacom Defendants' programming, including the networks *BET*, *CMT*, *Comedy*

*Central*, *MTV*, *Nickelodeon*, *Spike*, and *VH1* (together, the "Viacom Services"), to TWC

subscribers utilizing TWC's cable system.  Nonetheless, in clear contravention of the grant of

rights in the Viacom Affiliation Agreements, the Viacom Defendants have threatened legal

action against TWC for transmitting the Viacom Services to TWC cable subscribers who wish to

use their iPads in their homes as an additional screen to view their cable service, which includes the Viacom Services.

3.     The Viacom Defendants' threats ignore the uncontestable fact that the Viacom Affiliation Agreements do not in any way limit the types of video display devices upon which TWC subscribers may view programming provided through TWC's cable system.  The devices subscribers use to view programming in their homes have evolved over time from analog vacuum tube devices to flat screens – both plasma and LCDs – and now Smart TV's and tablets, such as iPads.  In anticipation of the changing marketplace for electronics capable of viewing video programming, TWC intentionally obtained from the Viacom Defendants a grant of broad distribution rights that is silent as to devices – whether the initial receive device (*e.g.*, a set-top box or a cable modem) or the display device (*e.g.*, black and white or color, 21" cathode ray tube TV or 55" flat plasma display or 9" tablet), thereby preserving a subscriber's ability to utilize multiple types and categories of video display devices without restriction, so long as that distribution takes place over TWC's cable system.  The distribution rights also give TWC the flexibility to employ appropriate signal formats and transmission technologies within its cable system that enable its subscribers to use these different video display devices in their homes.

4.     Consistent with its rights under the Viacom Affiliation Agreements, on March 15, 2011, TWC launched its TWCable TV iPad App, through which TWC makes certain cable programming viewable by its cable subscribers on Apple iPad tablet computers within the subscribers' homes ("in-home iPad viewing").

5.     TWC distributes the video programming for in-home iPad viewing solely through TWC's existing cable system.  That is, the same "pipe" that delivers video programming to set-

top boxes in its subscribers' homes is also used to deliver video programming to the iPad tablet. In many of its subscribers' homes, TWC distributes multiple "simulcast" versions of the same network in different formats so that the network can be received on the various devices in the subscribers' home:  for example, an analog format version that can be received in the cathode ray tube set in the basement, a standard definition digital version for the digital set in the kitchen, a high definition version for the large flat plasma screen in the family room, and now an IP format version that is compatible with the new generation of "Smart TVs" that combine television and computer capabilities in one device, and with tablets, such as iPads.  In-home iPad viewing simply enables TWC's cable subscribers to use the iPad as an additional display device within their homes, allowing them to view on their iPad the programming that they subscribe to and have paid for – and for which TWC has handsomely paid the Viacom Defendants – without the need to obtain another set-top box or television.

6.    Importantly, although the format employed by TWC for distribution to the iPad is commonly referred to as "IP," referring to the "Internet Protocol" format, TWC does not distribute the video programming to the iPad over the public Internet.  Rather, the signal is delivered to a subscriber's iPad through TWC's private and secure cable system.  Subscribers are able to view the programming only in their homes.

7.    TWC subscribers have in-home iPad viewing access only to those channels for which they have already paid.  TWC takes substantial security measures to prevent unauthorized access to the video programming, and to ensure that all of the users of in-home iPad viewing subscribe to any channel that they watch.

8.     The TWCable TV iPad App is only the latest method provided by TWC to permit its subscribers to watch video programming on a variety of video display devices linked to the TWC cable system.  In 2005, TWC launched an IP format service in San Diego called "Broadband TV" that, like the TWCable TV iPad App, utilized the TWC cable system to enable subscribers to view licensed video programming on another video display device – in that case a computer screen.  Although Viacom initially sent a cease-and-desist letter to TWC expressing concerns about Broadband TV, after TWC explained that the service was limited to in-home viewing of paid-for programming services over TWC's cable system – not the Internet – Viacom raised no further concerns, and Broadband TV continued under the then-existing agreements with Viacom until Broadband TV was discontinued by TWC in 2007.  Subsequently, in amended agreements for the Viacom Services, Viacom did not seek to describe or limit the types of devices upon which subscribers viewed programming distributed over the TWC cable system.  In fact, Viacom negotiated the Second Amendment Core Services Agreement (defined below), which was finalized in January 2006 and extended the term of the Core Services Agreement (defined below) for another ██████ years, *with full knowledge of the then-ongoing provision of Broadband TV.*  All of the Viacom Affiliation Agreements were further extended in January 2009.  Despite its documented complaints regarding Broadband TV, Viacom did not limit the scope of TWC's grant of rights in either of these contractual extensions.

9.     In late 2010 and early 2011, TWC began to preview its development of applications to enable in-home tablet viewing with an announcement by TWC's CEO on December 6, 2010, at the UBS Global Media and Communications Conference, and a public demonstration of what

would become in-home iPad viewing, using a tablet device from another consumer electronics manufacturer. The announcement garnered widespread notice in the trade press.

10. On December 14, 2010, Sandra Wells, SVP, Business & Legal Affairs at MTV Networks, a division of Viacom, wrote to Michelle Kim, Group Vice President & Chief Counsel, Programming, at TWC regarding TWC's CEO's public statements and unjustifiably stated "our affiliation agreements do not authorize TWC to distribute the MTVN and BETN services to iPads." On January 18, 2011, Ms. Kim responded to Ms. Wells, stating that the Viacom Affiliation Agreements provide "no limitations on the types of devices to which TWC can distribute your signals and our carriage rights are quite broad . . . ."

11. On March 15, 2011, TWC launched the TWCable TV iPad App, allowing cable subscribers who otherwise already receive cable programming from TWC in their homes to view a selection of that same programming on Apple iPad tablets in their homes. In-home iPad viewing has proven to be extremely popular with TWC subscribers. Between March 15, 2011, when TWC first made in-home iPad viewing available, and March 31, 2011, over 300,000 users downloaded the necessary software.

12. Notwithstanding Viacom's assent to TWC's previous Broadband TV service, on March 15, 2011, counsel for Viacom Inc., Peter Zimroth at Arnold & Porter LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel at TWC, claiming that "Viacom would consider any launch of an iPad application using its copyrighted content as a serious and material breach of the Affiliation Agreement and an infringement of its exclusive rights under copyright law."

13.     TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless. TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and the Viacom Defendants have not and cannot identify any contractual provisions of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

14.     On March 31, 2011, TWC, without prejudice to its rights, removed the Viacom Services from the programming that it offers its subscribers via in-home iPad viewing and replaced those networks with programming from cable programmers that had not objected to iPad viewing of their programming. Because TWC bargained in the Viacom Affiliation Agreements to allow its subscribers the flexibility to receive and watch the programming for which they have paid on any video display device in the home, TWC now seeks a declaration from this Court to make clear that it has the right under the Viacom Affiliation Agreements to transmit the Viacom Services to any screen capable of receiving such programming over TWC's cable system.

**THE PARTIES**

15.     Plaintiff Time Warner Cable Inc. is a Delaware corporation with its principal office at 60 Columbus Circle, New York, New York 10023. TWC is the second-largest cable television operator in the United States, with more than 14.4 million customers who subscribe to one or more of its video, high-speed data, and voice services.

16.    Defendant Viacom International Inc. is a Delaware corporation with its principal place of business in New York, New York.  Viacom is a global entertainment content company, providing television programming, motion pictures, and a wide range of digital media.

17.    Defendant Comedy Partners, an affiliate of Viacom, is a general partnership formed in New York with its principal place of business in New York, New York.

18.    Defendant Black Entertainment Television LLC, an affiliate of Viacom, and a successor in interest to Black Entertainment Television, Inc., is a Washington, D.C. limited liability company with its principal place of business in Washington, D.C.  Upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York and/or with their principal place of business in New York.

19.    Defendant Country Music Television, Inc., an affiliate of Viacom, is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

## JURISDICTION AND VENUE

20.    An actual and justiciable controversy exists between TWC and the Viacom Defendants concerning the non-infringement of the Viacom Defendants' copyrights by TWC and its subscribers by virtue of the Viacom Defendants' allegations of infringement against TWC. Accordingly, subject matter jurisdiction for this declaratory judgment action is proper in this Court under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

21.    Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state claims herein because these claims are related to, and form part of, the same case and controversy as the federal claims herein.

1233922.1

22.    This Court has personal jurisdiction over Defendant Viacom International Inc. because Viacom International Inc. is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Viacom International Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

23.    This Court has personal jurisdiction over Defendant Comedy Partners because Comedy Partners is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Comedy Partners' significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

24.    This Court has personal jurisdiction over Defendant Black Entertainment Television LLC because Black Entertainment Television LLC regularly does business in the State of New York and/or by virtue of Black Entertainment Television LLC's significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party. Furthermore, upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York and/or with their principal place of business in New York.

25.    This Court has personal jurisdiction over Defendant Country Music Television, Inc. because, under Country Music Television, Inc.'s agreement with TWC, the parties agreed to consent to personal jurisdiction in the State of New York for any proceeding arising out of or relating to the agreement between the parties.  CMT Agreement § 19(c) (Jan. 1, 1999). Furthermore, this Court has personal jurisdiction over Defendant Country Music Television, Inc. because Country Music Television, Inc. regularly does business in the State of New York and/or

8

by virtue of Country Music Television, Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

26.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(a).

## FACTUAL BACKGROUND

*The Viacom Affiliation Agreements*

27.   Plaintiff TWC is the second largest cable operator in the United States, with technologically advanced systems located mainly in five geographic areas:  New York State (including New York City), the Carolinas, Southern California (including Los Angeles), Ohio and Texas.  As of June 30, 2010, TWC served more than 14.4 million customers who subscribe to one or more of its video, high-speed data, and voice services.

28.   Viacom is a global entertainment content company, providing television programming, motion pictures, and a wide range of digital media.  Viacom's television business is organized into the MTV Networks ("MTVN") and the BET Networks ("BETN") divisions. BETN provides the *BET* and *Centric* channels.  MTVN provides various cable networks, including *MTV*, *VH1*, *Nickelodeon*, *Nick at Nite*, *Comedy Central*, *CMT*, *Spike*, *TV Land*, and *Logo*.

29.   TWC's rights to distribute the Viacom Services, among other Viacom networks, are set forth in agreements known in the industry as carriage or affiliation agreements. Specifically, TWC's rights to distribute the Viacom Services are set forth in a series of interrelated agreements (together the "Viacom Affiliation Agreements"), which for the purposes herein, include:

> (i) the agreement captioned "Affiliation Agreement" between MTVN and TWC, dated as of August 10, 2000, regarding distribution of *Nickelodeon*, *MTV*, *VH1* and *Spike* (the "Core Services Agreement");

(ii) the agreement captioned "Affiliation Agreement Comedy Central" among MTVN, Comedy Partners, and TWC, dated as of April 21, 2003, regarding distribution of *Comedy Central* (the "Comedy Agreement");

(iii) the agreement captioned "Black Entertainment Television Affiliation Agreement" between Black Entertainment Television, Inc. and TWC, dated as of November 1, 1995, regarding distribution of *BET*, and amendments thereto (the "BET Agreement");

(iv) the agreement captioned "Country Music Television Affiliation Agreement" between Country Music Television, Inc. and TWC, dated as of January 1, 1999, regarding distribution of *CMT* (the "CMT Agreement");

(v) the letter agreement between MTVN and TWC, dated as of November 9, 2004, amending the Core Services Agreement (the "First Amendment Core Services Agreement");

(vi) the letter agreement between MTV and TWC, dated as of January 1, 2006, amending and extending the term of the Core Services Agreement ("Second Amendment Core Services Agreement");

(vii) the term sheet captioned "Time Warner Cable/MTV Networks/BET Networks Term Sheet," dated as of January 1, 2009 (the "TWC/MTVN/BETN Term Sheet"); and

(viii) the letter agreement captioned "HD Simulcast Amendment," dated as of December 17, 2009 (the "HD Simulcast Amendment").

30.    The Viacom Affiliation Agreements constitute the binding agreements between TWC and the Viacom Defendants, as the parties specifically agreed that the Viacom Affiliation Agreements constitute the entire agreement between the parties with respect to the respective Viacom Services governed by those agreements.  See Core Services Agreement § 16(c) (Aug. 10, 2000); see also Comedy Agreement § 15(c) (Apr. 21, 2003); BET Agreement § 11(d) (Nov. 1, 1995); CMT Agreement § 22 (Jan. 1, 1999).

31.    TWC has distributed the Viacom Services to its cable subscribers pursuant to the Viacom Affiliation Agreements and has remitted over a billion dollars in fees to the Viacom Defendants on the basis of the payment terms set forth in the Viacom Affiliation Agreements.

32.    The Viacom Affiliation Agreements broadly provide for TWC to distribute the

Viacom Services through TWC's cable systems.  See Core Services Agreement § 2(a) (Aug. 10,

2000) (███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████); see also Comedy Agreement § 2(a) (Apr. 21, 2003); BET Agreement

§ 1(a) (Nov. 1, 1995); CMT Agreement § 1(a) (Jan. 1, 1999).  Moreover, TWC has been granted

broad rights with respect to the high definition feeds of each of the Viacom Services, which are

the specific feeds used in connection with the delivery of video programming for in-home iPad

viewing.  See HD Simulcast Amendment § 1 (Dec. 17, 2009) (████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████).

33.    The devices subscribers use to view television in the home continually change and

have evolved over time from analog vacuum tube devices to flat screen displays – both plasma

and LCD's -- and now Smart TV's, iPads and other tablets.

34.    TWC's agreements with the Viacom Defendants do not place restrictions on the

types of devices that subscribers can use to view programming distributed on TWC's cable

system in their homes.  Nothing in the Viacom Affiliation Agreements places any restriction on

TWC's distribution of the identified Viacom Services via TWC's private cable system to cable subscribers in their homes, or on the type or number of devices that may be used by TWC subscribers to receive the Viacom Services over TWC's cable system. Nowhere in the Viacom Affiliation Agreements is TWC required to deliver the Viacom Services only to set-top boxes.

*TWC's "Broadband TV" Service in San Diego*

35.    On or about July 8, 2005, TWC launched a service in San Diego that involved delivery of licensed content using the IP format to computers in the homes of TWC's cable subscribers. The service was called "Broadband TV." The trade and local press widely covered the launch of Broadband TV.

36.    In-home iPad viewing is nothing more than a version of Broadband TV. With Broadband TV, the video programming, which included many of the Viacom Services, was converted to IP format, was delivered in IP format using TWC's existing cable systems to cable subscribers only, and was distributed only to the cable subscribers' homes. The same is true of the TWCable TV iPad App. With Broadband TV, the Viacom Services could be delivered to laptops and desktop computers, such that the subscriber could use an in-home wireless network in connection with accessing the video programming.

37.    By letter dated July 20, 2005, Viacom expressed purported concerns about Broadband TV, stating that "[i]t has come to our attention through press reports that [TWC] has launched a version of Internet-protocol TV which offers video and high-speed Internet subscribers the ability to view certain program services over the Internet on their computers [and that] such Internet distribution is in violation of the Affiliation Agreement between TWC and MTVN dated as of August 10, 2000, as amended."

1233922.1

38.     By letter dated July 22, 2005, TWC responded that Broadband TV "is being offered over our cable system, not on the Internet and is being provided solely to TWC expanded basic customers, who already receive those same programming services [and that the] service simply provides a simulcast of the expanded basic tier for which TWC San Diego customers already pay in another technical format."

39.     After TWC's explanation, which applies equally to in-home iPad viewing, Viacom raised no further concerns with TWC, and Broadband TV continued under the existing agreements with Viacom until January 2007, when TWC decided to discontinue Broadband TV. As discussed above, TWC and the Viacom Defendants amended their various agreements multiple times after their July 2005 exchange of letters. In fact, during the very period in which TWC offered Broadband TV (i.e., July 2005 through January 2007), the parties negotiated the Second Amendment Core Services Agreement which extended the term of the Core Services Agreement from ███████████ through ███████████. In none of those negotiations did any of the Viacom Defendants ever seek to limit the scope of TWC's grant of rights, which are the same grant of rights at issue here. None of the subsequent amendments expressly addressed Broadband TV or related issues.

40.     In reliance on the breadth of the grant of rights in the Viacom Affiliation Agreements and in part, upon the Viacom Defendants' acquiescence in TWC's Broadband TV service in San Diego, TWC continued to develop new technological options that would enable its cable subscribers to view its video programming on different video display devices within the home.

*In-Home iPad Viewing*

41.    In late 2010, TWC began to preview its development of the TWCable TV iPad App to enable in-home iPad viewing.  Glenn Britt, the Chairman and CEO of TWC, announced on December 6, 2010 at the UBS Global Media and Communications Conference that TWC was "working on [] an app that will stream our video service to the iPad.  So if you want to use that as a TV screen in your home, you can."

42.    In January 2011, at the Consumer Electronics Show in Las Vegas, Nevada, TWC provided a public demonstration of what would become in-home iPad viewing using a tablet device from another consumer electronics manufacturer.

43.    These events were well-publicized and attended by a wide range of communications executives.  TWC received numerous inquiries from the public and other programmers about these services.  TWC's presentation at the Consumer Electronics Show was also made available on the Internet.

44.    On March 15, 2011, TWC launched the TWCable TV iPad App, making cable television programming viewable by its cable subscribers on their Apple iPads.  Specifically, subscribers to TWC's cable services now have the option to view on their iPad, <u>within their homes</u>, channels to which they have access through their TWC cable system and subscription.

45.    The technology for distributing video programming to cable television subscribers is constantly evolving.  Indeed, TWC has long employed a variety of formats to distribute video programming over its "pipes" and into the home in order to optimize the video feed for the particular devices used by its subscribers.

14

46.     The distribution of video programming to the subscriber's cable modem for in-home iPad viewing is functionally equivalent to the distribution of video programming to a TWC subscriber's set-top box for viewing on any other display device. The technology underlying the iPad distribution merely reflects another way in which TWC reformats the programming signals within its cable system, as it regularly does with respect to all types of video programming. In fact, in the Viacom Affiliation Agreements, TWC and Viacom specifically contemplated that the cable that comes out of a subscriber's wall could plug into devices other than a set-top box connected to a television, such as a cable modem in this case. <u>See</u> Second Amendment Core Services Agreement § 2(a) (Jan. 1, 2006) ████████████████████████ ███████████████████████████); <u>see</u> <u>also</u> First Amendment Core Services Agreement § 1 (Nov. 9, 2004) (████████████████████████████████ ████████████████).

47.     In distribution of video programming both to set-top boxes and to iPads, the video programming signal is received via satellite from the programmer, converted by TWC into digital formats that are compatible with TWC's cable systems, transmitted in IP format to TWC's distribution hubs, and delivered into the subscriber's home through TWC's hybrid fiber-coaxial (HFC) network – all through TWC's cable systems.

48.     Specifically, TWC provides video programming to its subscribers predominantly in the following manner: network programmers deliver digital feeds via satellite to an Integrated Receiver/Decoder (IRD) located at a TWC facility. TWC usually receives this satellite feed either in MPEG-2 or MPEG-4 format. The feed is then transmitted to an encoder via Serial Digital Interface (SDI), Asynchronous Serial Interface (ASI) or Ethernet. A video re-encode

15

process is employed to convert all signals to an MPEG-2 format and optimize it for distribution to the set-top box.  The feed is then wrapped into an MPEG-2 transport stream, and transmitted to the TWC distribution hubs in IP format.  It is then transmitted to TWC's subscribers across TWC-controlled cable systems and is ultimately delivered into the TWC subscriber's home through a coaxial cable.

49.     The distribution of video programming to the subscriber's cable modem for in-home iPad viewing utilizes essentially the same process, except the video is re-encoded into H.264/MPEG-4 format and transmitted using HTTP Live Streaming (HLS) transport protocol, which is another IP transport format.

50.     Once TWC's HFC cables enter the TWC subscriber's home, one feed enters a subscriber's set-top box or other device set up to receive the signal, and another enters the subscriber's cable modem.  The cable modem receives a quadrature amplitude modulation ("QAM") modulated radio frequency signal containing encapsulated IP packets and redistributes those IP packets to a variety of home networks, including, for example, Ethernet and WiFi networks commonly used to render the programming on certain consumer electronic video display devices, including the iPad.  Indeed, such modems are now being built into set-top boxes directly.  Both set-top boxes and modems serve similar functions with regard to these feeds, such as by ensuring that the feed is securely transmitted to the viewing device (e.g., a television, an iPad, or another display device) and ensuring that the customer is authorized to receive the channels.

51.     The video programming that is distributed via cable modem to a TWC subscriber's iPad for in-home iPad viewing is never transmitted over the public Internet.  The video

16

programming is instead transmitted through TWC's proprietary, purpose-built cable system –

whether delivered to an iPad, a set-top box, a personal computer with a cable card, or any of the

many other devices a TWC subscriber may have in the home that are capable of receiving the

feed.

52.     In order to view any of the networks on the iPad, TWC subscribers must first

download the TWCable TV iPad App from Apple's iTunes App Store and go through a series of

authentication steps to ensure that the subscribers are in fact TWC cable subscribers and that they

are accessing the video programming from within their homes.

53.     To enable in-home iPad viewing, TWC employs a number of authentication

measures to ensure that the TWCable TV iPad App will function only over the TWC cable

systems.  Through these procedures, TWC confirms that the iPad is connected through an

address authorized to operate on the TWC network, and that the subscriber is connected through

his or her home cable modem, and requires that subscribers utilize passwords that verify they are

TWC customers.  In-home iPad viewing is limited to those channels to which the subscriber is

entitled under the terms of his or her TWC subscription.  Additionally, TWC's subscriber

agreement requires its customers to encrypt the wireless routers they use to receive the signal on

their iPads.

54.     None of the video programming distributed for in-home iPad viewing is stored on

the iPad.

55.     Thus, just as TWC employs tight security measures in connection with set-top

boxes to ensure that its programming is viewed only by authorized subscribers, it employs

security measures for iPad viewers that provide comparable protection.  TWC takes these

17

substantial security measures, and more, to prevent unauthorized access to the video

programming and to ensure that all of the users of the TWCable TV iPad App are paying for any

channel that they watch.

56.    TWC's provision of its application for in-home iPad viewing is merely an

enhancement of features and transport that it otherwise employs in connection with the delivery

of its cable services to its existing subscribers.  Enabling in-home iPad viewing is not the same as

providing a broadband data or cable modem service.  The programming is not viewed over the

public Internet.  It is just the same programming being distributed over the cable system onto a

different screen within the home.

*In-Home iPad Viewing Is Very Popular Among TWC Subscribers*

57.    The TWCable TV iPad App experienced high consumer demand on the first day of

its release, ranking as the most frequently downloaded free "app" in Apple's iTunes App Store.

This interest demonstrated clearly to TWC that its subscribers wanted to use their iPad as a

viewing device in their homes.

58.    Between March 15, 2011 and March 31, 2011, more than 300,000 users

downloaded the TWCable TV iPad App.

*Viacom's Cease and Desist Request*

59.    On March 15, 2011, counsel for Viacom Inc., Peter Zimroth of Arnold & Porter

LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel,

TWC, claiming that "Viacom would consider any launch of an iPad application using its

copyrighted content as a serious and material breach of the Affiliation Agreement and an

infringement of its exclusive rights under copyright law."

1233922.1

60.    TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless.  TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and the Viacom Defendants have not and cannot identify any contractual provision of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

61.    The programming networks made available to subscribers for in-home iPad viewing on March 15, 2011, included *BET, CMT, Comedy Central, MTV, Nickelodeon, Spike*, and *VH1*.

62.    On March 31, 2011, TWC removed the Viacom Services from the programming that it offers to its subscribers for in-home iPad viewing, replacing the Viacom Services with programming from cable networks that had not objected to iPad viewing of their programming.

*DISH Network already displays Viacom programming on iPads*

63.    By seeking to restrict TWC's ability to provide the Viacom Services to its paying subscribers through their iPad devices within their own homes, the Viacom Defendants have put TWC at a competitive disadvantage vis-à-vis other multichannel video programming distributors of the Viacom Services.

64.    For example, DISH Network, one of the two largest satellite television providers that competes with TWC, has launched a similar service permitting delivery not only to an iPad but to almost any Internet-connected device, both inside and outside of the home.  See Press Release, DISH Network, *DISH Network is First Pay-TV Provider to Give Customers Ability to*

19

*Watch Their Live TV on iPad*, Dec. 1, 2010.  Thus, unlike TWC, DISH Network offers its

customers equipment that allows video programming to be viewed both in the home on a variety

of devices, and also remotely over the public Internet.

65.    Upon information and belief, the Viacom Defendants have not provided DISH with

any special license allowing this kind of both inside and outside-the-home, Internet distribution.

Nor have the Viacom Defendants taken any action to prevent DISH Network from displaying the

Viacom Services on iPads or any other device inside or outside of the home.


*Smart TV's and Other Video Display Device Applications For Subscribers*

66.    The Viacom Defendants' refusal to abide by the grant of rights in the Viacom

Affiliation Agreements has far broader implications than viewing over iPads.  TWC will shortly

enable other devices utilizing its cable system to view video programming.  For example,

television manufacturers are now introducing a next generation of  Smart TV's, and TWC is in

the process of finalizing an application for its subscribers to view programming on Smart TV's.

There is no fundamental difference between the way TWC will distribute video programming

over its cable system to iPads, Smart TV's, or other viewing screens.

67.    Unlike the case with iPads, however, TWC's customers would be able to view

TWC's services on Smart TV's through set-top boxes in addition to cable modems.  The

principal benefit to TWC and its customers from using the IP format to serve these devices is that

it will eliminate the need for customers to lease set-top boxes from TWC, thereby saving them

money and making viewing more convenient.  Finding alternatives to set-top boxes has been a

policy priority for the Federal Communications Commission ("FCC"), and TWC and other

multichannel video programming distributors have been working to support the policy and

1233922.1

provide additional convenience for its customers.  See, e.g., *In re Video Device Competition*, Notice of Inquiry, 25 F.C.C. Rcd. 4275 (April 21, 2010).

68.    TWC is fully authorized under the Viacom Affiliation Agreements to develop and launch an application for Smart TV's, as well as other comparable devices in the future, without having to seek consent from, or pay additional carriage fees to, the Viacom Defendants.

## COUNT ONE

### (Declaratory Judgment – In-home iPad Viewing and Other Subscriber Viewing Applications)

69.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 68, as if fully set forth herein.

70.    Under the terms of the Viacom Affiliation Agreements, TWC is authorized to distribute the Viacom Services to its subscribers via its cable system so that subscribers can watch the Viacom Services on video display devices of their choice, including their iPads, regardless of the transmission technology, using applications provided by TWC.

71.    The Viacom Defendants are not entitled unilaterally to alter any terms of the Viacom Affiliation Agreements and have no basis under the Viacom Affiliation Agreements upon which to object to subscriber use of different video display devices, such as iPads or "Smart TV's," to view video programming distributed by TWC over its cable system.  There are no limitations under the grant of rights in the Viacom Affiliation Agreements restricting the video display devices, whether televisions, iPads, or Smart TV's, that TWC subscribers may utilize to watch programming distributed over the TWC cable system.

72.    The Viacom Defendants have demanded that TWC cease and desist from the distribution of the Viacom Services through the TWCable TV iPad App, which utilizes the same TWC cable system through which other TWC services are provided.

73.    The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to TWC.  There is no adequate alternative remedy.

## COUNT TWO

### (Declaratory Judgment – Non-Infringement of Copyrights)

74.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 73, as if fully set forth herein.

75.    In the Viacom Affiliation Agreements, the Viacom Defendants have granted TWC a broad license for TWC to distribute the Viacom Services through TWC's cable systems.

76.    Under the Viacom Affiliation Agreements, TWC is authorized to launch the TWCable TV iPad App to enable subscribers to engage in in-home iPad viewing of the Viacom Services.

77.    As a licensee acting lawfully within its rights under license agreements granted by the Viacom Defendants, TWC did not infringe any copyrights held by the Viacom Defendants during the two-week period in which TWC enabled certain subscribers to view the Viacom Services on iPads in their homes.

78.    The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to TWC.  There is no adequate alternative remedy.

22

1233922.1

WHEREFORE, plaintiff respectfully requests that the Court:

1.     Declare that, under the grant of rights in the Viacom Affiliation Agreements, TWC is authorized to provide services to its subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services, that enable subscribers to view video programming distributed on TWC's cable system on a video display device of their choice in the home;

2.     Declare that TWC, as a licensee acting lawfully within the grant of rights under the Viacom Affiliation Agreements, is not infringing any copyrights held by the Viacom Defendants, by providing services to its subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services, that enable subscribers to view video programming distributed on TWC's cable system on a video display device of their choice in the home;

3.     Award TWC plaintiff's costs, attorneys' fees, and such other and further relief as the Court may deem just and proper.

Dated:          New York, New York
                April 7, 2011

                          COWAN, LIEBOWITZ & LATMAN, P.C.

                          By: _____
                              Ronald W. Meister (rwm@cll.com)
                              1133 Avenue of the Americas
                              New York, New York  10036-6799
                              Telephone:  (212) 790-9200
                              Fax: (212) 575-0671

                              CAHILL GORDON & REINDEL LLP
                              Jonathan D. Thier (jthier@cahill.com)
                              Brian T. Markley (bmarkley@cahill.com)
                              80 Pine Street
                              New York, NY 10005-1702
                              Telephone:  (212) 701-3000
                              Fax: (212) 269-5420

                              Attorneys for Plaintiff
                              Time Warner Cable Inc.

1233922.1